

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-19-00228-CV

In the Interest of **T.N.J.J.**, D.J., and B.B.M., Children

From the 224th Judicial District Court, Bexar County, Texas
Trial Court No. 2017-PA-02673
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:     Irene Rios, Justice
Dissenting Opinion by: Rebeca C. Martinez, Justice

Sitting:        Rebeca C. Martinez, Justice
                Irene Rios, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: November 27, 2019

AFFIRMED

  C.M. appeals from a judgment terminating his parental rights to T.N.J.J., D.J., and B.B.M.[1]

On appeal, C.M. challenges the sufficiency of the evidence to support the trial court's finding that

termination of his parental rights was in the children's best interest. *See* TEX. FAM. CODE ANN.

§ 161.001(b)(2). C.M. also challenges the sufficiency of the evidence to support the trial court's

finding that he failed to timely file an admission of paternity. *See id*. 161.002(b)(1). C.M. does not

challenge the trial court's findings of statutory grounds for termination. *See id*.

161.001(b)(1)(N),(O),(P). We affirm.

---

[1]To protect the identity of the minor children, we refer to the appellant and the children by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

**BACKGROUND**

The Texas Department of Family and Protective Services filed an original petition claiming C.M. was the alleged father of T.N.J.J., D.J., and B.B.M., and seeking to terminate his parental rights. At the time, T.N.J.J. was seven years old, D.J. was five years old, and B.B.M. was a newborn. The children were removed from their home and the Department was appointed their temporary managing conservator. The case was tried to the court after it had been pending for fourteen months.

### *The Department's Evidence*

At trial, two caseworkers testified on behalf of the Department. The Department's evidence showed that the children were removed when the youngest child was born and tested positive for amphetamines and marijuana. At the time of removal, both C.M. and the children's mother admitted to a Department caseworker that they used illegal drugs. C.M. and the children's mother were the children's primary caregivers. After the children's removal, the trial court ordered C.M. to participate in a psychological evaluation, individual counseling, drug and alcohol assessments, and drug testing. Additionally, the trial court ordered C.M. to comply with each requirement set out in the Department's original and any amended family service plan, to provide the Department with his current address and telephone number, and to promptly (within five days) notify the Department of any change of address or telephone number.

A Department caseworker prepared a family service plan for C.M. and reviewed it with him. The family service plan was amended twice. C.M. signed the original family service plan and the two amended family service plans. Among the goals articulated in the family service plans were C.M. "demonstrat[ing] the willingness and ability to protect the child[ren] from harm" and "alter[ing] behaviors that expose the children to risk." The family service plans required C.M. to

participate in a drug assessment and individual counseling; to complete a parenting class; and to submit to random drug testing, both urine analysis and hair follicle.

The first caseworker testified that C.M.'s compliance with the service plan was minimal. C.M. completed a psychological evaluation and a drug assessment. In the drug assessment, C.M. provided conflicting answers. C.M. denied that he used drugs but also stated that when not using alcohol or drugs he would try to hurt himself. Based on the drug assessment, the Department required C.M. to engage in drug treatment. The caseworker told C.M. about the drug treatment requirement and arranged outpatient drug treatment for him. Nevertheless, C.M. did not participate in outpatient drug treatment.

The first caseworker, who was assigned to the case for approximately nine months, testified that C.M. submitted to only one drug test. This drug test was ordered by the trial court. The results of this drug test were positive. The caseworker directed C.M. to take more than two additional drug tests, but C.M. did not appear for these drug tests and he did not provide a reason for not attending. The caseworker also testified that she was often unable to reach C.M.

Once the Department was appointed temporary managing conservator, the children were placed with relatives on a temporary basis. The children were placed in the homes of three different relatives before being placed in a foster home. During at least two of these relative placements, C.M. had unrestricted visitation with the children. The caseworker did not know the frequency of C.M.'s visits during the relative placements. The caseworker had asked the first relative about the frequency of C.M.'s visits, but she was not provided a clear answer.

Additionally, the first caseworker testified that she had concerns about C.M.'s stability. C.M. had provided her with an address, but it was not his actual address. C.M. had also told her that he did not have a permanent place to live, but he said that he had a job. However, C.M. could not provide the caseworker with proof of his employment.

The second Department caseworker testified that C.M. was not engaged in services when she took over the case. She nevertheless made sure that the necessary referrals were in place so that C.M. could engage in services. This caseworker acknowledged that C.M. completed a parenting class, but she also testified that C.M. failed to engage in other services required by his service plan. C.M. began individual counseling at Serenity Family Services but was ultimately dismissed from counseling for lack of attendance. After C.M. was dismissed from individual counseling, the caseworker re-referred him to Serenity. This time C.M. failed to attend any individual counseling sessions as required.

Additionally, the second caseworker directed C.M. to take a drug test on four occasions. C.M. did not submit to any of these drug tests. C.M. did not offer a reason for failing to attend the first three drug tests, but he did offer a reason for failing to attend the last drug test. C.M. said he did not attend the last drug test because he did not have an identification card.

As to visitation, the second caseworker testified that C.M. did not visit the children while they were in foster care. C.M. did ask the caseworker about scheduling a visit with the children; however, a visit was not arranged because C.M. said that he did not have transportation to the city where the children were living.[2]

As to employment and housing, the second caseworker testified that C.M. had told her that he was working through a temporary agency, but he did not provide her with any proof of employment. According to this caseworker, C.M. did not have safe, stable housing.

Finally, as to the children's present living situation, the second caseworker testified that she had visited the children in their foster home shortly before trial. The children were doing extremely well in their foster home. Before coming into foster care, T.N.J.J. was essentially the

---

[2]The children's foster home was in a city about 300 miles from San Antonio, Texas.

caretaker for her two younger siblings. In foster care, however, T.N.J.J. no longer had to be a caretaker and she was able to focus on being a child. The caseworker described D.J. as "very happy." The caseworker testified: "For the first time since I met him, [D.J.] came running in and hugged me and just said that he was good." Finally, B.B.M. was also "very well cared for" in foster care. Although B.B.M. had previously suffered from "flakey, very dry" skin, he now had "silky smooth skin." According to the caseworker, the children also had their own rooms and their own toys in their foster home. Overall, the caseworker stated that the children were "extremely well cared for" in their foster home.

### C.M.'s Evidence

C.M. testified on his own behalf. According to C.M., he had been the children's sole caregiver at the time of their removal. The children's mother did not help him. C.M. denied that he and the children's mother were living together at the time of removal, claiming that he and the children's mother had not lived together for six or seven years. According to C.M., he had no knowledge that the children's mother was using drugs while she was pregnant with B.B.M. C.M. further testified that he did not have a drug problem in the past. Specifically, C.M. testified: "I mean, I smoked marijuana, that's about it. No addiction to whatever."

With regard to the services in his service plan, C.M. testified that he had attended six counseling sessions and he had completed a drug assessment. C.M. initially denied that he was told that he needed to engage in drug treatment. According to C.M., he was told that drug treatment was voluntary. Because he believed that drug treatment was voluntary, C.M. attended three NA and AA sessions.[3] However, C.M. later testified that he actually was aware that he was required

---

[3]Narcotics Anonymous and Alcoholic Anonymous, respectively.

to engage in drug treatment. C.M. then stated: "I tried my best. I mean, I was also told that I needed to keep a good job and finish these [parenting] classes, as well."

C.M. acknowledged he had only appeared for one drug test. He claimed that he missed his first two drug tests because they were scheduled on the same day as his parenting class. C.M. decided to go to the parenting class because he believed he could take the drug tests another day. C.M. also testified that the reason he had missed another drug test was because it was scheduled on a Saturday and the testing facility was closed. Finally, C.M. testified he had missed the last drug test because he was still on probation at his job. C.M. claimed that he had asked the caseworker if he could take this drug test at a twenty-four-hour facility, but she told him that none was available.

As to his employment and housing, C.M. testified he had been employed at his current job for about a month. C.M. also testified that he was currently living in a hotel room, but he was hoping to rent an apartment soon after the trial. C.M. explained that he had delayed finding stable housing until after he had obtained a better paying job. C.M. believed that his current job would enable him to be stable for his children.

After hearing the evidence, the trial court terminated C.M.'s parental rights on two independent bases. First, the trial court terminated C.M.'s parental rights because it found that C.M., who was an alleged father, did not respond to the Department's petition by timely filing an admission of paternity. *See* TEX. FAM. CODE ANN. § 161.002(b)(1). Second, the trial court terminated C.M.'s parental rights because it found, by clear and convincing evidence, three statutory grounds to support termination: (1) C.M. had constructively abandoned the children; (2) C.M. had failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the children; and (3) C.M. had used a controlled substance in a manner that endangered the health and safety of the children and had failed to

complete a court-ordered substance abuse program or after completion of such a program continued to abuse a controlled substance. *See id*. § 161.001(b)(1)(N),(O),(P). The trial court also found that termination of C.M.'s parental rights would be in the children's best interest. *See id*. 161.001(b)(2). C.M. appealed.[4]

**TERMINATION UNDER SECTION 161.001(B)**

Termination of parental rights under section 161.001 of the Texas Family Code requires proof by clear and convincing evidence of at least one of the grounds listed in section 161.001(b)(1)(A)-(U) and that termination is in the children's best interest. *See id*. § 161.001(b). In this case, C.M. argues the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in the children's best interest pursuant to section 161.001(b)(2). C.M. does not challenge the sufficiency of the evidence to support the trial court's findings as to any of the statutory grounds under section 161.001(b)(1). *See id.* § 161.001(b)(1)(N),(O),(P).

### *Standards of Review in Parental Termination Cases*

When conducting a legal sufficiency review in a parental termination case, we look at all the evidence in the light most favorable to the finding to determine if a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence the factfinder could have disbelieved or could have found to be incredible. *Id*. However, this does not mean that we disregard all evidence that does not support the finding. *Id*. "Disregarding undisputed facts that do not

---

[4]The trial court's judgment also terminated the parental rights of the children's mother, but she did not appeal.

support the finding could skew the analysis of whether there is clear and convincing evidence." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

When conducting a factual sufficiency review in a parental termination case, we must decide if the "factfinder could [have] reasonably form[ed] a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This heightened standard of review, which corresponds to the clear and convincing standard of proof required at the trial level, strikes a balance between the constitutional interests implicated by the termination of parental rights and the deference appellate courts must have for the role of the factfinder. *Id.* at 25-26; *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.).

In a parental termination case, evidence is factually insufficient only if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). This factual sufficiency standard "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d at 631. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* We may not reweigh witness credibility or substitute our judgment for that of the factfinder; instead, we are obligated to defer to the factfinder's credibility determinations as long as its determinations are not unreasonable. *In re J.P.B.*, 180 S.W.3d at 573. We "must give due consideration to evidence the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266.

*Factors Relevant to Best Interest*

In evaluating the children's best interest, courts consider the non-exhaustive *Holley* factors.[5] *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013); *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). However, "[t]he absence of evidence about some of these [factors] would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d at 27. Courts also consider the factors set forth in section 263.307(b) of the Texas Family Code.[6] TEX. FAM. CODE ANN. § 263.307(b). A best interest analysis may consider direct and circumstantial evidence, subjective factors, and the totality of the evidence. *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.* Evidence that proves one

---

[5]These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

[6]Under section 263.307(b) of the Texas Family Code, these factors are considered in determining whether the parent is willing and able to provide the child with a safe environment: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE ANN. § 263.307(b).

or more statutory grounds for termination may also constitute evidence illustrating that termination is in the children's best interest. *In re C.H.*, 89 S.W.3d at 28.

With these standards and factors in mind, we consider the evidence as it relates to the children's best interest.

### *Drug Use/ Failures to Participate in Drug Treatment and Drug Testing*

The evidence showed that the children were removed from C.M.'s care because of drug use by C.M. and the children's mother. At the beginning of the case, C.M. admitted to a caseworker that he used drugs. Notwithstanding the trial court's temporary orders and the service plan requiring C.M. to submit to random drug testing, C.M. failed to submit to at least six drug tests requested by the Department. The trial court could have reasonably inferred that C.M.'s failure to appear for drug testing indicated that he was avoiding testing because he was using drugs. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("A factfinder reasonably could infer that [Mother's] failure to submit to the court-ordered drug screening indicated she was avoiding testing because she was using drugs."); *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) ("The jury could reasonably infer that appellant's failure to complete the scheduled screenings indicated she was avoiding testing because she was using drugs."). In fact, during the fourteen months this case was pending, C.M. submitted to only one drug test. This drug test was ordered by the trial court during a pre-trial hearing. The results of this drug test were positive.

C.M.'s drug use and his failures to submit to drug testing and participate in drug treatment during the pendency of this case are relevant to multiple *Holley* factors, including the emotional and physical needs of the children now and in the future, the emotional and physical danger to the children now and in the future, C.M.'s parental abilities, the stability of C.M.'s home, and the acts or omissions which may indicate the existing parent-child relationship is not a proper one. *See*

*Holley*, 544 S.W.2d at 371-72. "A parent's decision to engage in illegal drug use during the pendency of a termination suit may support a finding that the parent engaged in conduct that endangered the [children's] physical or emotional well-being." *In re Z.J.B.,* No., 14-18-00759-CV, 2019 WL 347474, at *5, *7 (Tex. App.—Houston [14th Dist.] Jan. 29, 2019, pet. denied) (recognizing in its best-interest analysis that a father's single positive drug screening and his failure to complete three other scheduled drug screenings during the pendency of the case weighed in favor of the trial court's finding that termination of his parental rights was in the child's best interest). A factfinder can give "great weight" to evidence of a parent's drug use, which supports a finding that termination is in the children's best interest. *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (considering mother's admissions of drug use, use of synthetic urine to conceal her drug use, and failure to submit to drug testing in analyzing best-interest factors of child's needs and danger to the child). A parent's illegal drug use is relevant in gauging parental abilities and acts or omissions indicating the existing parent-child relationship is not a proper one. *In re L.C.L.*, No. 14-09-00062-CV, 2019 WL 3126147, at *9 (Tex. App.—Houston [14th Dist.] July 16, 2019, no pet.) (noting a parent's conduct in testing positive for several drug tests, her failure to appear for at least four drug screenings, and her failure to take advantage of services provided by the Department to treat her drug use was evidence of acts or omissions indicating the parent-child relationship was not appropriate and weighed in favor of a finding that termination was in the children's best interest). Furthermore, a parent's illegal drug use exposes the child to the possibility that the parent may be impaired or imprisoned. *In re E.R.W.*, 528 S.W.3d at 264. Thus, a parent's illegal drug use is also relevant to whether a parent can provide his children with consistency and stability.

In his testimony, C.M. attempted to dispute that he was aware of the requirement that he participate in drug treatment. However, C.M.'s testimony on this point was contradictory. Initially,

on direct examination, C.M. testified that he believed his participation in drug treatment was voluntary and he asserted that he had attended several NA and AA sessions. C.M. also testified that he was not aware that he was required to engage in drug treatment. However, on cross-examination, C.M. admitted that he was aware that he was required to engage in drug treatment, and he claimed that he had done the best he could. The trial court could have disregarded C.M.'s testimony that he was not aware that he was required to engage in drug treatment. Not only did C.M. provide conflicting testimony about his awareness of the drug treatment requirement, the trial court's temporary orders and the Department's original and amended service plans called for C.M.'s participation in any recommended drug treatment.[7]

Additionally, in his testimony, C.M. attempted to dispute some of his illegal drug use. C.M. testified, "I smoked marijuana, that's about it. No addiction to whatever." However, the trial court could have properly decided not to credit C.M.'s testimony that, apart from marijuana, he did not use illegal drugs or have a drug addiction. *See D.F. v. State*, 525 S.W.2d 933, 939-40 (Tex. Civ. App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.) (recognizing that the trial court was not required to accept the truth of parent's testimony in a parental termination case, especially where inconsistencies in the parent's own testimony and the testimony of other witnesses tended to create a doubt as to the truth of her statements). Other evidence contradicted C.M.'s claim that he was drug-free, including C.M.'s admission of drug use at the time of the children's removal, the results of C.M.'s drug assessment, and C.M.'s positive drug test.

Under *Holley*, a court may consider any excuses a parent may provide for his acts or omissions. 544 S.W.2d at 372. During his testimony, C.M. offered several explanations for his

---

[7]The trial court's temporary orders required C.M. to comply with each requirement set out in the Department's original or any amended service plan formulated during the pendency of this suit. The original and amended service plans required C.M. "to attend and participate fully in the [drug] assessment" and to "FOLLOW ALL RECOMMENDATIONS."

failure to participate in drug testing, but the trial court was not required to accept these explanations. In addition to the single drug test to which C.M. submitted, the Department's caseworkers scheduled at least six other drug tests for C.M. C.M. offered explanations for his failure to take "the very first two" drug tests and the last two drug tests. C.M. explained that he had missed the first two drug tests because they were scheduled on the same day as his parenting class, that he had missed another drug test because it was scheduled on a Saturday when the testing facility was closed, and that he failed to attend the last drug test because he was on a probationary period with his job and he did not want to miss work. Nevertheless, C.M. offered no excuses or explanations for missing the remaining two drug tests. On this record, the factfinder certainly could have disregarded C.M.'s testimony concerning his failure to participate in drug testing. Thus, the trial court could have properly resolved the evidence of C.M.'s drug use and his failure to participate in drug treatment in favor of its finding that termination was in the children's best interest.

***Willingness and Ability to Provide the Children with a Safe Environment***

Section 263.307(a) of the Texas Family Code provides that "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a). Section 263.307(b) lists many factors courts may consider in determining whether the child's parents are willing and able to provide the children with a safe environment.

A child's need for permanence through the establishment of a stable, permanent home is the paramount consideration in a best-interest determination. *See In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Stability and permanence are paramount in the upbringing of children."). Stability was especially important for the children in this case, who had been placed with three different sets of relatives before being placed in their current foster home.

In the present case, the relevant section 263.307(b) factors include: "the child[ren]'s age and physical and mental vulnerabilities;" "the frequency and nature of out-of-home placements;" "whether there is a history of substance abuse by the child[ren]'s family;" "the willingness and ability of the child[ren]'s family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;" and "the willingness and the ability of the child[ren]'s family to effect positive environmental and personal changes within a reasonable period of time." *See* TEX. FAM. CODE ANN. § 263.307(b)(1),(2),(8),(10),(11).

The evidence showed that the three children in this case were still quite young and vulnerable. At the time of trial, the oldest child, T.N.J.J., was eight years old; the middle child, D.J., was only six years old; and the youngest child, B.B.M., was only fifteen-months old.

As previously discussed, there was evidence of C.M.'s drug use and his failures to participate in drug testing and drug treatment as required. Additionally, under both the original and amended service plans, C.M. was required to participate in individual counseling. As to individual counseling, both the original and amended service plans stated: "[C.M.] *will schedule, attend, and actively participate in individual counseling* at Serenity Family Services to address individual issues/goals as well as the concerns/goals of the Department. This will be ongoing throughout the case." (Emphasis added). A caseworker testified that C.M. began counseling at Serenity, but he was dismissed from counseling for lack of attendance. The caseworker also testified that after C.M. was dismissed from counseling, she re-referred him to Serenity. Once again, C.M. failed to attend any individual counseling sessions as required. Based on C.M.'s acts and omissions, the trial court could have reasonably concluded that C.M. had failed to effect positive personal changes within a reasonable amount of time.

The evidence also showed that C.M. had failed to cooperate with the Department's close supervision. C.M. was required to provide the caseworkers with his address and phone number,

but he did not consistently do so. Both of the caseworkers assigned to this case testified that they had had a difficult time contacting C.M. while this case was pending. One of the caseworkers testified that she was concerned about C.M.'s stability because she did not know if he had a stable residence and he did not provide proof that he had a job.

C.M. testified that at the time of trial he had been employed for only about a month. According to a caseworker, C.M. was working through a temporary agency. C.M. further testified that he was currently living in a hotel room. C.M. claimed that he had beds for the children, and that if the children were returned to him, he could find a place for him and the children to stay. C.M. added that he was hoping to lease an apartment on the Monday after trial. According to C.M., his extended family was willing to help him with the children as long as the Department was not involved.

At the end of his testimony, C.M. did not ask for the immediate return of the children. Instead, C.M. asked for more time. C.M. stated: "If I can just get a little bit more time, I could show you guys that I'm the image that y'all need me to be, what my kids need me to be." Nevertheless, by the time of trial, this case had been pending for fourteen months. Trial had been re-set three times at C.M.'s request. The trial court could have reasonably concluded that C.M. had been afforded ample time to demonstrate his ability to parent the children and to provide them with a safe and stable environment. "A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child." *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). The trial court could have reasonably concluded that the relevant section 263.307(b) factors supported a finding that termination was in the children's best interest.

We recognize that the absence of evidence about the Department's plan for the permanent placement of the children is not dispositive. As the Texas Supreme Court has stated,

the lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located. Instead, the inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment.

*In re C.H.*, 89 S.W.3d at 28.

In sum, the trial court could have reasonably concluded that C.M. had used illegal drugs while this case was pending, and that C.M. had failed to participate in drug treatment and individual counseling as required. Additionally, the trial court could have reasonably concluded that C.M. had failed to effect positive personal changes within a reasonable amount of time, and that C.M. was unwilling and unable to take the steps necessary to provide the children with a safe and stable environment.

Giving due consideration to evidence that the trial court could reasonably have found to be clear and convincing, and based on our review of the entire record, we hold that the trial court could have formed a firm belief or conviction that termination of C.M.'s parental rights was in the children's best interest. The disputed evidence that the trial court could not have credited in favor of its best-interest finding is not so significant that the trial court could not have formed a firm belief or conviction that termination was in the children's best interest.

Having reviewed the record and considered all the evidence in the appropriate light for each standard of review, we conclude the evidence is legally and factually sufficient to support the trial court's best interest finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 631; *In re J.P.B.*, 180 S.W.3d at 573.

## TERMINATION UNDER SECTION 161.002

C.M. also challenges the other basis for the judgment terminating his parental rights. *See* TEX. FAM. CODE ANN. § 161.002(b)(1). In a separate issue, C.M. argues the evidence is legally

and factually insufficient to support the trial court's finding that he failed to timely file an admission of paternity. However, we need not address this issue. *See* TEX. R. APP. P. 47.1 (requiring opinions to address issues necessary to the final disposition of the appeal). As discussed above, the trial court's best interest finding is supported by legally and factually sufficient evidence. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Furthermore, C.M. does not challenge the trial court's findings of statutory grounds for termination. *See id.* § 161.001(b)(1)(N),(O),(P). Therefore, we uphold the trial court's termination judgment under section 161.001(b). *See id.* § 161.001(b).

## CONCLUSION

The trial court's judgment terminating C.M.'s parental rights is affirmed.

Irene Rios, Justice